JOSHUA D. HURWIT, STATE BAR NO. 9527
UNITED STATES ATTORNEY
DAVID J. MORSE, STATE BAR NO. 10066
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 W. MYRTLE ST. SUITE 500
BOISE, ID 83702-7788
TELEPHONE: (208) 334-1211

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>TYLER JAY WATSON,<br><br>　　　　Defendant. | Case No. 1:22-cr-00149-BLW<br><br>**GOVERNMENT'S CLOSING BRIEF** |

## INTRODUCTION

After an evidentiary hearing held on Wednesday September 6, 2023, to address Defendant's motion to suppress the evidence seized on June 7, 2022, the Court asked the parties to file closing briefs to address, among other topics, Defendant's voluntary statements to law enforcement and whether his parole condition and the circumstances leading up to the statements, despite the administration of his Miranda warning, were considered coercive rendering his statements involuntary.

GOVERNMENT'S SUPPLEMENTAL BRIEF - 1

## FACTS PRESENTED AT HEARING

Sometime, a month or so prior to Defendant's search and arrest, investigators were made aware of Defendant's involvement in a drug trafficking organization. Approximately ten days prior to the search, investigators intercepted both wire and electronic communication between Defendant and his supplier. That communication led investigators to believe that Defendant was trafficking in very large quantities of fentanyl powder (enough to generate a weekly payment of at least $15,000 to his supplier). Based upon that information, information from a CI that Defendant stored controlled substances at two different locations, and information from IDOC Probation and Parole Officers ("P&P") that Defendant was on parole with a "4th waiver" and was known to frequent his current registered residence with his mother (Adams St. address) and his previously registered residence with grandmother (Nez Perce St. address), investigators planned an operation to stop and search Defendant. The plan, according to investigators, was to conduct a traffic stop to perform a P&P search of his vehicle. For the purposes of officer safety, they decided to conduct a traffic stop under the guise of a traffic violation. Although there was in fact a traffic violation, investigators had probable cause to believe that Defendant was involved in some type of drug trafficking activity and that he was associated with a large-scale drug trafficking organization. That was sufficient for P&P to request a stop and search of Defendant's vehicle under the terms of his parole. Additionally, investigators had independent probable cause to search his vehicle based on all the drug-trafficking related facts known to them at the time.

Sometime in the late morning to early afternoon of June 7, 2022, Officer Jared Scott, who had been briefed on the operation earlier in the day, received direction from Sgt. Shane Huston to conduct a traffic stop on Defendant for failing to use his turn signal. Officer Scott performed the

stop and obtained Defendant's license and registration, asked some questions to gauge Defendant's demeanor and cooperation level, and ensured that there were no firearms or weapons in the vehicle that could be used to harm any officers on the scene. He then received confirmation from P&P that they wanted the vehicle searched. Upon receiving that confirmation, Officer Scott detained Defendant, placed him in handcuffs, and put him in the back of his police vehicle while he and other investigators searched the vehicle. While investigators were searching the vehicle, P&P Officer Steve Landers spoke to Defendant and asked him whether they would find any drugs in the vehicle. Defendant stated they would not. After some further exchanges about the vehicle trunk, P&P Officer Landers ended his conversation with Defendant and continued searching the vehicle. A short while later, P&P Officer Chance Nicholas arrived on scene, stated his disappointment in Defendant's performance on parole, and asked Defendant for the code to access his cell phone. Defendant provided the information and the communication between P&P Officer Nichols and Defendant ended.

  After officers completed the search of Defendant's vehicle, they discovered two magnetic boxes attached to the undercarriage of the vehicle below the driver's side door, which corroborated the information provided to investigators by the confidential informant. Based on this discovery, Defendant was arrested for the unlawful possession of controlled substances.

  Defendant was then transported by NPD Officer Scott to his residence where he remained in Officer Scott's patrol vehicle while investigators searched his residence. Either during or shortly after the search, Det. Coronado approached Defendant while he was sitting in the back of the patrol vehicle. According to Det. Coronado, he was accompanied by DEA Special Agent Aaron Ferguson and DEA Intelligence Analyst Shelly Hall. All three individuals were in plain

clothes. Det. Coronado read Defendant his Miranda warning and Defendant advised investigators that he understood that warning, wished to waive his right to remain silent, and agreed to speak with investigators. At that point Det. Coronado explained that they would be heading to search Defendant's grandmother's residence and asked if they would find anything there. Defendant responded that they would. After that conversation ended, investigators left the residence location and drove to the grandmother's residence to search that house.

      When they arrived at the grandmother's residence Det. Coronado, SA Ferguson, and P&P Officers Nicholas and Landers knocked on the door and greeted Defendant's grandmother. They explained why they were there and asked permission to search her home. Defendant's grandmother granted them permission to search the house and provided them with a key to access the attached garage. Investigators then began to search the garage. During their search, Det. Coronado asked Defendant if he would be willing to show investigators where the controlled substances were so that they could avoid messing up his grandmother's garage. Defendant agreed and showed them where the drugs and illicit drug proceeds were located. In sum, investigators found over four and a half kilograms of fentanyl powder, approximately two ounces of methamphetamine, and $8,600 in illicit drug proceeds.

      It is notable that there were no interaction between the P&P Officers and Defendant after the initial traffic stop. In fact, Officer Landers testified that it is common practice for P&P Officers not to interact with parolees nor be involved in investigatory interviews once contraband is found. Officer Landers explained the purpose of that is to ensure that parolees do not feel coerced into answering an investigating officer's question because of the parole conditions.

GOVERNMENT'S SUPPLEMENTAL BRIEF - 4

**ARGUMENT**

The three main issues are: (1) whether the stop was unlawfully prolonged; (2) whether Defendant was administered his Miranda warning and voluntary waived his right against self-incrimination; and (3) whether the search of his grandmother's residence was based on information obtained from a coerced statement.

**1. The Traffic Stop**

The traffic stop was not unlawfully prolonged because investigators used the traffic violation as a means to safely detain Defendant to allow for a P&P search of the vehicle. The evidence confirmed that P&P was aware that Defendant was involved in drug trafficking, which was a violation of his parole condition, and as a result asked law enforcement officers to assist in a P&P search of Defendant and his vehicle.

In addition to P&P's knowledge of Defendant's involvement in drug trafficking, investigators had independent knowledge from a CI and a from intercepted wire and electronic communications that Defendant was not only involved in drug trafficking but also likely possessed controlled substances in or on the vehicle. Specifically, the CI told investigators that Defendant was known to hide controlled substances in small magnetic boxes under the vehicle on the driver's side of the vehicle. It was no surprise when investigators found two magnetic boxes in that exact location.

As the Government provided in its Response to Defendant's Motion to Suppress (ECF No. 31), "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*,

575 U.S. 348, 350, 355 (2015). Investigators had more than reasonable suspicion to believe Defendant was involved in drug trafficking. The entire team, including Patrol Officer Scott were aware of Defendant's involvement in the drug trade and his parolee/"4th waiver" status. The stop was lawfully prolonged, and Defendant was detained, to further investigate that suspicion. It was not until after they discovered the drugs in Defendant's vehicle that his status changed from detained to "under arrest."

### 2. Miranda Warning

Defendant was administered his Miranda warning by investigators before they began any custodial interrogation. Det. Coronado testified that he administered Defendant his Miranda warning and read into the record the warning he provided. He also testified that Defendant was asked if he understood his warning and Defendant confirmed his understanding of the warning showing that his waiver of Miranda was voluntary. Defendant also admitted that Det. Coronado provided him with his Miranda warning at a later interview a short while after the first time the warning was administered. In the recording of the interview at the Nampa Police Department, Defendant states that he recalled being administered the warning and that he agreed to speak to investigators. His only concern was whether he would get cooperation credit and whether his name would appear in any reports. The record is void of any testimony or proffer by Defendant that law enforcement failed to administer his Miranda warning before he provided any incriminating statements. We then must look to whether the statements were voluntary.

### a. Voluntariness of Miranda Waiver

The test is whether the waiver and subsequent statements were voluntary based on the totality of the circumstances, recognizing that waivers can be voluntary despite the presence of

GOVERNMENT'S SUPPLEMENTAL BRIEF - 6

negative factors. *See, Berghuis v. Thompkins*, 560 U.S. 370 (2010), and *Colorado v. Connelly*, 479 U.S. 157 (1986). The Government must show, by a preponderance of the evidence, that the waiver was voluntary. *Id* at 168. In *United States v. Gaddy*, 532 F.36 783 (8th Cir. 2008), In that case, Defendant argued that he had not slept the night prior to his interrogation, had consumed a large quantity of alcohol and drugs several hours before he waived his rights, and that law enforcement's dynamic entry into his home was designed to confuse him so much so that there was no way his waiver, 20 minutes after their entry, was voluntary. *Id.* at 787-788. There, investigators testified that *Gaddy* appeared awake and coherent, and *Gaddy* did not tell them that he was tired, intoxicated or under the influence of drugs. *Id.* Investigators testified that *Gaddy* looked calm and was very compliant. *Id.*

There are no similar facts here. Instead, investigators met with Defendant after the traffic stop had ended, while he was sitting in the back of Officer Scott's patrol vehicle, and in the absence of any P&P officer. The investigators were in plain clothes and in fact, one of the individuals was not even a sworn law enforcement officer (Intelligence Analyst Hall). There in no indication that the Miranda waiver was involuntary.

### b. Voluntariness of Post Miranda Statements.

What's also completely absent from record, and different from the situation in *Gaddy*, is any assertion by Defendant that he was coerced or that his statements were involuntary. The assertions in briefings and the attempted inferences from cross-examination were that the conditions, by their very nature, were coercive. However, there is nothing in the record, statements or otherwise, to indicate Defendant was confused, scared, disoriented, or under the influence of any substance. In fact, Det. Coronado testified that Defendant was calm and

cooperative during their interaction in the back of the police vehicle at the mother's address, at the grandmother's address, and later at the Nampa Police Department. In sum, the evidence points to a voluntary and uncoerced statement by the Defendant post Miranda.

When we review P&P condition 1 (Defense Ex. B), there are several notable points to consider.[1] First, the condition requires cooperation with the *probation/parole* officer, not *any* law enforcement officer. Second, that cooperation requires being truthful. P&P Officer Landers testified that he approached Defendant during the vehicle search, explained who he was, and asked whether they would find any contraband in the vehicle. Defendant told Officer Landers that they would not find anything other than syringes. However, that statement was not truthful. So, even though "being truthful with his probation/parole officer" was a requirement under the terms of supervision, he knowingly failed to adhere to that condition. Meaning, any argument Defendant may attempt to make that he was compelled to be truthful, despite the Miranda warning he received, because of that condition, fails. Even if Defendant attempts to creatively argue that Officer Landers was not *his* probation/parole officer and was therefore not required to be truthful, he would only reinforce the Government's position. That position is that he had no obligation nor requirement to be truthful or cooperate with anyone other than his probation officer. His statement to Officer Landers demonstrated as much.

Third, absent from the supervision agreement is any requirement to speak to law enforcement officers in general. Instead, the condition goes further by clearly directing the parolee to tell any law enforcement officer the parolee encounters that he is on felony

---

[1] "I will cooperate with the requests of my probation/parole officer. Cooperation includes being truthful. If I am detained by law enforcement, I will tell the officer(s) that I am on felony supervision, and the name of my probation/parole officer."

supervision and to provide the name of his probation/parole officer. Again, the condition provides no instruction to cooperate, or answer any law enforcement officers' questions.

Finally, we turn to the testimony of both P&P Officers Landers and Nicholas. While they both spoke to Defendant and asked questions related to the P&P search, they did not illicit any incriminating information from Defendant. During their conversation, Defendant was simply being detained while P&P, with the assistance of local law enforcement officers, conducted the vehicle search. He was not in custody. Additionally, neither Officers Landers nor Nicholas directed Defendant to cooperate with law enforcement officers nor answer any law enforcement officers' questions. In fact, after investigators found controlled substances in Defendant's vehicle, neither Officer Landers nor Nicholas communicated or interacted with Defendant *at all*. Officer Landers even testified that it is his practice and that of other P&P officers to stop interacting with probationers/parolees after contraband is found and turn the investigation over to non-P&P officers so as not to interfere with the investigation or run into a situation where a defendant feels compelled to incriminate themselves in their communications with law enforcement officers.

Simply put, there is no evidence, either based on his testimony or proffered statements, that Defendant's Miranda waiver was involuntary or that his statements to investigators were coerced or involuntary. To the contrary, Defendant was in the same situation as any other individual who is discovered with controlled substances and facing charges. He was handcuffed in the back of a police car, administered his Miranda warning, given an opportunity to waive his Miranda rights and cooperate with law enforcement. He did exactly that knowing the consequences of his waiver.

GOVERNMENT'S SUPPLEMENTAL BRIEF - 9

### 3. Inevitable Discovery:

Even if the Court concludes that Defendant's statements were involuntary, the evidence uncovered at his grandmother's house (Nez Perce address) is still admissible. The Supreme Court has held that the "inevitability of legal discovery of evidence is constrained by demonstrated historical facts capable of ready verification or impeachment." *Nix v. Williams*, 467 U.S. 431, 444 (1981).

In the instant case, Det. Coronado testified that he had independent information from a CI that Defendant stored controlled substances at both his mom's and his grandmother's house. There was also evidence from P&P that prior to changing his registered address to his mom's house, Defendant was residing at his grandmother's residence. This information led investigators to believe he was storing drugs at his grandmother's residence. That knowledge was demonstrated during Det. Coronado's interaction with Defendant in the back of the police vehicle. Based on his testimony, he told Defendant that investigators would be going to his grandmother's house next to conduct a search and asked if they would find anything there. At that point, Defendant stated that they would find controlled substances there.

That information shows, by a preponderance of the evidence, that investigators would have inevitably gone to the grandmother's house to conduct a search and found the drugs belonging to Defendant at the grandmother's residence.[2]

### CONCLUSION

---

[2] The Government played the audio recording of investigator's interaction with Defendant's grandmother, her consent allowing investigators to search the garage, and her provision of the garage door key allowing investigators to enter the garage.

GOVERNMENT'S SUPPLEMENTAL BRIEF - 10

For these reasons, the Court should find that the Government met its burden, by a preponderance of the evidence, to show that the traffic stop was not prolonged, that investigators had independent reasonable suspicion to further their investigation of the stop, that the P&P vehicle search was appropriate, that Defendant was properly administered his Miranda warnings, voluntarily waived those warnings, and that all his statements were uncoerced voluntary statements that are admissible evidence.

Respectfully submitted this 15th day of September, 2023.

JOSHUA D. HURWIT
UNITED STATES ATTORNEY
By:

*/s/ David J. Morse*
DAVID J. MORSE
Assistant United States Attorney