Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
Telephone: (208) 724-2617
Facsimile: (208) 906-8663
chd@fergusondurham.com
ISB No. 6428

Attorney for Defendant Watson

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>v.<br><br>TYLER JAY WATSON,<br><br>                Defendant. | Case No. 1:22-cr-00149-BLW<br><br>**DEFENDANT WATSON'S CLOSING ARGUMENT** |

The Court has asked the parties to file post-hearing briefing instead of presenting oral closing arguments. To the extent that Mr. Watson does not address an issue here, he incorporates and relies on his memorandum (Dkt. 22-1), reply memorandum (Dkt.

1

35), and supplemental brief on *United States v. Estrella*, 69 F.4th 958 (9th Cir. June 6, 2023) (pet. for rehearing filed August 21, 2023). (Dkt. 42.)

<u>The Search During the Traffic Stop was Unreasonable</u>

The reason for the traffic stop and search of Watson's car has evolved as this case has progressed. Law enforcement agents wrote in their initial incident reports that Nampa patrolman Jared Scott stopped Watson because Watson failed to indicate a turn. Def. Ex. D, E. Then, according to the reports, Officer Scott "was advised by Det. Sgt. Huston that Probation and Parole would like Tyler detained and a search conducted of his vehicle." Def. Ex. D. Likewise, the two parole officers who were involved in the case – Landers and Nicholas – also drafted their reports in a way to suggest that they, too, learned of the traffic stop only after it happened. *See* Def. Ex. E, attachments. The initial version was that Officer Scott conducted a routine traffic stop, discovered that the driver was on parole, and was told by his superior that P&P would like a parole compliance search.

At the suppression hearing, however, Detective Coronado testified that the true reason for the stop was to search Watson's car as part of a larger drug trafficking investigation into a federal prison inmate, Palomera, and that Parole Officer Landers had authorized a parole compliance search, if one was needed, before the traffic stop. Coronado and Officer Scott also testified that Coronado briefed Scott about this "operation" in general terms before the traffic stop.

The Court should view with a jaundiced eye the failure of these seasoned law enforcement officers to include such important information in their initial incident reports. Those reports were at least misleading – concealing that P&P was acting as kind of a stalking horse for task force drug investigators – which should cast a cloud over their credibility.

But even if the Court credits the officers' testimony at the suppression hearing, Watson respectfully contends that the search of the car was still unreasonable.

   A.   *The Automobile Exception is Inapplicable*

"Under the automobile exception to the warrant requirement, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010). Probable cause requires reasonable cause to believe that evidence will be found on the property that is to be searched. *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). While Watson may have been on Detective Coronado's radar as a potential underling for Palomera, Coronado did not have probable cause to believe that Watson was ferrying drugs in his car on a quiet residential street in Nampa around noon on June 7, 2022.

Coronado was aware that Watson may have been working for Palomera because Watson's telephone number, and some text communications, had cropped up while officers had a wiretap on Palomera's phone. That, and the fact that other unidentified

sources apparently told officers that Watson was selling fentanyl in the area. Coronado also testified that a source had tipped him that Watson used magnetic boxes under his car to transport drugs, but we nothing else about that tip, such as who that source was, when he or she told Coronado that, or what any of other details were.

There is much more that Coronado did *not* know. He had not conducted surveillance of Watson before that day, was not involved in a controlled buy from Watson, did not pull Watson's trash to look for evidence, and did not know his general comings and goings in his car. He did not know when Watson went to work, when he went to his girlfriend's house, or when he went anywhere else. Officer Scott also admitted at the suppression hearing that aside from what he learned in the alleged pre-traffic stop briefing, nothing Watson said or did during the stop would have given Scott suspicion to believe that evidence of a crime might be found in the car.

These officers did not have reasonable grounds to believe that Watson would have drugs on him or in his car when he was pulled over, which is likely why they enlisted P&P's help for a "parole search."

B. *The Stop and Search of the Car Cannot be Justified as a Parole Search*

The Government argues that the officers were nonetheless justified in searching the car as a part of a parole compliance check. The United States Supreme Court has held that a person on parole has a diminished expectation of privacy and that suspicionless searches of a parolee may be reasonable under the Fourth Amendment

4

after considering the totality of the circumstances. *Samson v. California*, 547 U.S. 843, 857 (2006). One salient circumstance in *Samson* was that California had a well-known statute that required parolees to agree to submit to suspicionless searches at any time. *Id*. at 852.

The Ninth Circuit has interpreted *Samson* as requiring the searching officer to still have some level of knowledge that the person searched is on parole and has a search waiver condition, rather than justifying the search on that basis after the fact. *United States v. Caseres*, 533 F.3d 1064, 1075–76 (9th Cir. 2008) (citing *Samson*, 547 U.S. at n.5, for the principle that an officer who lacked prior knowledge of a parole search condition would be acting unreasonably). Recently, a panel of the Ninth Circuit held that the requisite level of knowledge is "probable cause." *Estrella*, 69 F.4th at 970-71. This Court should tread cautiously with *Estrella*, because a petition for rehearing en banc is pending. *See United States v. Estrella*, Appeal No. 22-10027, Dkts. 41, 48. Regardless, as Watson noted in his supplemental brief on *Estrella*, the information that Officer Scott claims he had about Watson and his parole conditions is light years from what the officer possessed *Estrella*.[1] (Dkt. 42, pp. 1-6.)

---

[1] Though Officer Scott testified at the suppression hearing that Coronado told him that Watson was on parole and that he knew Watson had a search waiver condition of parole (neither of which was in Scott's police report), that was the extent of it. The Government offered no additional detail about the level of Scott's knowledge, unlike the situation in *Estrella*.

Perhaps more importantly, as the Court noted at the suppression hearing, the scope of the Fourth Amendment waiver is problematic in this case. Idaho does not have a statute like California does, though Watson did have an alleged waiver in his parole conditions. Def. Ex. B, C. But there is a material difference between the search waiver that is in Watson's conditions of release that the Parole Commission imposed on him and the waiver that Idaho Department of Correction's P&P Department included as part of its "Agreement of Supervision" with Watson. The Parole Commission required Watson to submit to searches only by "the supervisory authority or at the direction of the Commission." Def. Ex. C, p. 2. On the other hand, the IDOC Agreement of Supervision attempts to broaden the scope of the waiver to include "any agent of IDOC *or a law enforcement officer*." Def. Ex. B, p. 1 (emphasis added).

IDOC lacks the legal authority to broaden substantive parole conditions that the Commission has already set, as this Court found in *United States v. Thomas*, 2017 WL 1591831, at *7-8 (D. Idaho, 2017). There, the Court held that a term in the parolee's Agreement of Supervision that purported to expand a search waiver to cover any "structure" that the parolee had "controlling authority" over, instead of just his or her "residence," would not be enforced. *Id*. The Court relied on Idaho appellate cases to conclude that the Board of Correction can impose "supervisory" conditions but cannot change the substantive conditions that the Commission has imposed. *See id.* (citing *Mellinger v. Idaho Dep't. of Correction*, 757 P.2d 1213, 1219 (Id. Ct. App. 2007) and *State v.*

6

*Santana*, 394 P.3d 122, 126 (Id. Ct. App. 2017)). A search waiver is a substantive condition. *Id*.

Officer Scott began the search of Watson's car and eventually found the drugs under the car. He was not part of Watson's "supervisory authority." The Court should find that Watson's search waiver in his release conditions did not extend to a law enforcement officer.

<u>Watson's Statements were Not Voluntary</u>

If, contrary to Watson's argument, the Court concludes that one of his parole conditions justified his detention and the search of his car, then surely the additional condition that he must "cooperate" and be "truthful" with P&P officers, on pain of going back to prison, is just as forceful. That condition put Watson in the same classic penalty situation, where the exercise of one right forfeits another, as the probationer found himself in *United States v. Saechao*, 418 F.3d 1073, 1075 (9th Cir. 2005).

The Government pushed back on this idea at the suppression hearing and tried to portray Detective Coronado's interview with Watson at the patrol car as a stand-alone interaction divorced from what P&P was doing that day. The facts suggest otherwise.

Several witnesses characterized the activity that day as a parole compliance search, and that message was passed on to Watson early and often. It started with Officer Lander's instruction to detain Watson and to search his car. It continued when

7

Officer Jared Scott told Watson that his "parole officer" asked him to search Watson's car. It continued when Officer Nicholas spoke with Watson, took his phone, and asked for his password. It continued yet again when Officer Landers arrived and spoke with Watson, asking him what "we" would find in the car and telling him, not asking, that "we" were going to search his house. Neither Nicholas nor Landers gave Watson his *Miranda* warnings. From the get-go, these law enforcement officers let Watson know that P&P was in charge and that he had no choice in the matter.

The waters are muddied further by Officer Landers' shape-shifting role. At the suppression hearing, Landers candidly admitted that he is the "liaison" between P&P and the drug task force and that he shares intelligence with the task force. In fact, he is so embedded within the Nampa Police Department that he keeps his office there. Though Landers wanted the Court to believe that he goes out of his way not to confuse parolees about what his role in an investigation is, and that he stays out interrogations seeking evidence that may incriminate the parolee in a criminal matter, that testimony should ring a little hollow given his actions here.

As a result, even if Detective Coronado read Watson his *Miranda* rights before he spoke to him, that fact does not alter the outcome. Detective Coronado did not record that interaction, though he recorded others that day. He did not give Watson a written statement of his rights or receive a signed waiver. When he interrogated Watson, the "parole search" was still ongoing, and Watson had been detained and in the back of a

8

patrol car for a lengthy period. He had been moved from the location of the traffic stop to his home. Up to that point, he had been given no choice to refuse anything that was happening to him. He was completely in the control of police officers, task force agents, and parole officers. Even if parole officers were not standing side-by-side with Cornado at the very moment of the interview, they were present at all other times.

In short, whether Coronado read Watson his rights does not change the compulsion that all the circumstances of this event put on Tyler Watson to comply with a request to talk or face the loss of his liberty. His incriminating statements that he stored drugs at his grandmother's home were not free and voluntary made.

That statement led officers to continue the search, and all evidence flowing from the initial illegality should be excluded. The Government may try to claim that the police would have inevitably discovered the drugs and contraband at Watson's grandmother's home. The inevitable discovery doctrine "permits the government to rely on evidence that ultimately would have been discovered absent a constitutional violation." *United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009). The government bears the burden of proving inevitable discovery by a preponderance of the evidence. *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000)

It is true that officers testified a the suppression hearing that they asked Watson's grandmother for consent to search, and she gave them a key. What is missing is any evidence that they would have done that *but for Watson telling them in advance that the*

9

*drugs would be found there. See United States v. Lopez-Soto*, 205 F.3d 1101, 1107 (9th Cir. 2000) (holding that the inevitable discovery doctrine was inapplicable because "the government provided no evidence of what Officer Hill would have done if he had not stopped Lopez–Soto when he did."). It is the Government's burden to prove inevitable discovery or that the taint of any prior illegality was purged by intervening events. The Government cannot carry that burden here.

Respectfully submitted on this 15th day of September, 2023.

/s/Craig H. Durham
Attorney for Tyler Watson